Haywood, J.
delivered the opinion'of himself and Judge Peck.
This action was commenced the 26th day of July, 1821; joint demise laid in the names of James G. Martin, Thomas Hopkins, and William Cocke, for 19,000 acres of land, in the county of Rhea; notice to Messrs. John Wasson, Thomas Godbihere, and John Knight.'
At September term of the Circuit Court of Rhea County, 1821, Richard G. Waterhouse is admitted to defend jointly with the tenants in possession, *314 and by his counsel presented the affidavit of the deputy clerk, which states that Mr. Darby took out the writ in this suit, that he did not show any authority to him to use the name of Hopkins, that he had seen Hopkins, who denied that he had authorized the suit; also, that William Cocke had not authorized him, the clerk, to issue such writ for him ; another affidavit, stating that Hopkins had denied having authorized bringing the suit.
On this, the attorney for the defendant moved for a rule to produce authority, if any such there was, from Hopkins and Cocke, for the bringing this action, and if not produced that the suit would be dismissed. The Court refused the rule, and exception is taken to the opinion of the Court.
The defendants then plead the general issue, with notice for improvements.
Affidavits are filed, first, by Martin, excepting to the County of Rhea ; then an affidavit of Richard G. Waterhouse, to the counties of Bledsoe, Marion, and Blount; then Martin, to Knox, Hamilton, Morgan, Roane, and Warren ; then Waterhouse, to all that part, commonly called West Tennessee.
Thereupon the Court adjourned the cause to the County of Anderson, “ being the nearest county free from exception.” To this order exception is taken.
At August term, 1823, a trial was had, and verdict for the plaintiff.
By a bill of exceptions taken at tire trial, it appeared that the land had been granted to Stockely Donelson, the 20 th July, 1796 ; deed of conveyance from Stockely Donelson to Elizabeth Donelson, his wife, and James Glasgow, 25th October, 1799, which deed recites that a deed of trust had been made the 12th of August, 1797, between said Donelson, Glasgow, and Elizabeth, for all said Donelson’s lands in the counties of Hawkins, Knox, and Greene, containing one hundred and thirty thousand acres ; to have and to hold to the said Glasgow his heirs and assigns, to the uses and trusts therein mentioned; and that by said deed he was, on request, to make such other and further assurances of said lands as said Glasgow might require; then describing the same land mentioned in the grant, and stating a request to make, it is conveyed to said Glasgow; to him, his heirs and assigns, to the only proper use, and in trust for Elizabeth Donelson, her heirs and assigns forever.
Next follows a deed of conveyance from John Anderson, Elizabeth Anderson, formerly Elizabeth Donelson, and James Glasgow, to John Mc’Iver, dated 15th December, 1813, for the same land. This deed purports to be made for the consideration of ten thousand dollars.
Then a deed from McTve.r to Martin, for a like consideration, dated the 3d day of July, 1821, for the same land. The defendants proved in the possession.
The defendants then produced in evidence a deed of conveyance from *315 Stockely Donelson to John Rhea, dated the 25th July, 1800, for one undivided third part of the same land, described in the grant and deeds above mentioned ; then a deed from said Rhea, dated 22d of September, 1813, acknowledged the same day, registered 21st September, 1814, to Richard G. Waterhouse, for 2,500 acres, describing the same by metes and bounds, being part of the 19,000 acres described above, which 2,500 acres was proved to cover the land in dispute.
Next the defendants produced a judgment at the suit of Cowan against Donelson, rendered third Monday of June, 1805; sundry fieri facias’ had issued, and been returned, nothing found ; one, which issued the 20th April, 1814, was levied on the 19,000 acres of land, as Donelson’s property, and sale made 14th of July, 1814; deed from the sheriff under said sale, the 27th July, 1814, acknowledged 28th July, 1814, registered September after ; the land was purchased at the sheriff’s sale, by James Gillaspie, for twenty dollars, and the deed made to Waterhouse, by Gillaspie’s order.
The plaintiff then read in evidence a deed of conveyance by Littlepage Simms, who executes the same, as attorney in fact for Elizabeth Donelson and James Glasgow, to Richard G. Waterhouse, dated the 25th day of December, 1807; also, this article of agreement, dated the 24th day of September, 1806: “By and between Littlepage Simms and Elizabeth Donelson, both of Roane County.
“ Article first: Littlepage Simms agrees to sell for Elizabeth Donelson nineteen thousand acres of land, in the county of Roane, between Cumberland Mountain and Tennessee River, or as'much thereof as in his power, which he engages to make use of, he accounting with the said Elizabeth, at the rate of one dollar and fifty cents per acre for river land, and one dollar per acre for land off the river.
“ Article second: Elizabeth Donelson agrees on her part, that on payment of the money for land sold by said Simms, from time to time, to execute quitclaim deeds, and that all said Simms sells the lands for above the prices aforesaid he shall retain to himself.
“ Article third: Reservation to John Henry;” &c., signed by the parties, without seals, and witnessed by James Glasgow. The deed recited in that to James Glasgow and Mrs. Donelson, of the 25th October, 1799, was also read, but it was agreed not to cover the land in dispute.
Plaintiff called Wasson, a witness, who proved that he went to Rhea County in 1806, and has lived there since; that Littlepage Simms made a crop in the bounds of the 19,000 acre grant in 1806, remained there until about 1808, when he departed, and returned in 1809. Witness, in 1807, obtained a judgment against one Holmark, and levied ah execution on the improvement and corn of Holmark; the improvement was the place where Water-house lives. At the sale, Simms bid against witness ; witness purchased ; and Simms afterwards gave him a horse for the improvement, saying he *316 wanted it for Waterhouse. Holmark ran away, and Jacob Moore came to the place, built a house, as witness understood, for Waterhouse.
Roddy proved that Simms farmed on the 19,000 acres in 1806, but did not know under what authority; continued there until 1808. Thompson proved that in 1806, Simms made his bond to Purdy for some land ; Purdy sold to James Thompson the same land; Purdy took possession by order of Simms, and James Thompson held, also, by deed from Mc’Clung.
Defendants proved by William Johnston that the deed from Rhea to Waterhouse covers the land in dispute where Wasson and Waterhouse now live; that Wasson has been in peaceable possession for seven years before instituting this suit. Witness moved on the land in 1806 ; Wasson and his father have been in possession since that time ; thinks that Was-son’s father entered on the possession as an occupant, and had nothing to do with Simms. Witness purchased in 1809, from Waterhouse; Simms advised him to do so, saying that Waterhouse had the best title, and his recommendation was the inducement to do so ; has understood that Wasson holds under Waterhouse. It was admitted that Stockely Donelson died in September, 1805.
On this evidence the Court charged the jury, that under the deeds from Rhea and the sheriff, founded on Cowan’s judgment, the Statutes of Limitation would be a bar in favor of the defendants; but if they believed Waterhouse took possession under Mrs. Donelson, he could not protect himself under the Statutes of Limitation under either of these titles.
On the evidence and charge of the Court, the jury found a verdict for the plaintiffs.
A rule for a new trial was entered by the defendants, and by the Court discharged.
Appeal in the nature of a writ of error was taken to this Court.
It is admitted in argument that instead of 19,000 acres there are perhaps 200,000 acres in the grant.
Upon the facts stated in this record, there are made at the bar several principal questions, and divers subordinate ones. The main questions are: what effect is produced by the deed from Simms to Waterhouse, and the possession which Waterhouse had of the lands in question ?
Secondly, what effect is produced by the deed of Rhea to him, and the possession which he had ?
Thirdly, what effect is produced by the sheriff’s deed to him under Cowan’s judgment F
As to the first question the defendant claiming in this action under the deeds from Rhea and the sheriff, and by force of the Act of Limitations, and by an adverse possession under these deeds from the day of their date, the plaintiffs, in order to show that his possession was not adverse to the title of Mrs. Donelson, have produced the deed from Simms to him, and *317 insist that he took possession under this deed, and that such possession was held under Mrs. Donelson, and was her possession; and hence arises the subordinate question, whether he took possession under this deed at all, and if under the deed, was it for himself or under Mrs. Donelson ? It would seem that Water-house took possession under the deed, and not independently of it; because, between the date of the deed and the date of Rhea’s deed to Waterhouse, the latter sold part of the 19,000 acres to a purchaser, to whom he was recommended by Simms as having the best title, which he could not then have possibly had, but under the deed. If he took possession under Holmark’s occupancy, then he would not have been in possession of the whole 19,000 acres, hut only of Holmark’s occupancy ; and by virtue of that he could not have made this sale. He took the possession after the deed, and no doubt under it; for his subsequent acts are incompatible with the supposition that he claimed only Holmark’s occupancy, or that he acted as the sub-agent of Simms; for in this latter character he could not have sold and made conveyances himself. He was neither in as a sub-termor nor sub-agent, but under the deed.
That he took possession under the deed is manifest from the sales made between the date of it and Rhea’s deed to Waterhouse himself. Whether he took possession for himself, or under Mrs. Donelson, is another consideration. When it is said in the books that one is in possession under another, the idea communicated is a very indistinct one; for if A purchase and get a deed from B, he is in one sense in possession under B, yet the possession is for himself and is his own, and not that of B. But if A is tenant for life, or years, by conveyance from B, he is then, strictly speaking, in possession under B, and so long as any one is in after him in continuance of the same estate and possession, he is in possession under B, and his possession is B’s possession; and neither the first nor any subsequent tenant under him, can convert that possession into one adverse to the title of B. If an adverse claimant of the inheritance release to such tenant, that release will not merge the term ; because the term and the inheritance which comes to it are in different rights; the release in jure proprio, and the term or possession from, and in support of, another estate. Nor can the termor, in case the inheritance of a dispossessed claimant shall come to him by descent or otherwise, alien the same to a stranger, except by feoffment; because, such alienation would be a transfer of a chose in action; more properly speaking, of a right of entry. Nor could the ousted claimant alienate his claim to a third person, for the same reason. For want of a union of the release and term, in the case above supposed, the tenant would remain a tenant still to his landlord, and could not acquire the freehold, and would not be in possession of the estate conveyed by the release; and all transfers by him made, or by others claiming under him, would be transfers of rights of entry, and the conveyances would be void. *318 No person having the fee could enter but the ousted claimant; and if he entered, claiming the fee, though by virtue of a deed from the lessor, he would be in for himself, and not for the lessor. So, likewise, if one pretending authority from ' the lessor convey to the bargainee, in fee, and he enter, the possession would be for himself, and not for the lessor. The mistake in the present case arises from calling Simms a lessee; whereas he is no lessee, but one having authority, which would determine by his death, or revocation by the principal; whereas, if he were lessee, his interest would not determine by death ; nor could it be cancelled by the simple revocation of the principal.
If this were a contract between Waterhouse and Mrs. Donelson, by the intermediation of Simms, her attorney, then what was stipulated in conformity with the power might be good, and the rest void; but could a conveyance in fee be reduced to a contract to sell, and the latter be considered as a part of the former? Suppose it reduced to a contract, what sum is Waterhouse to pay? Not $500, for,this is not the sum which the power authorizes.. Could it be said, then, that the sum he was to pay was that authorized in the power ? He might say, I did not agree to give the sura specified in the power, but only $ 500. Surely he could not be made to pay $19,000, or $250,000, when he had only agreed to give $500. What, then, would be agreed in the contract that the power authorized ? Nothing but a conveyance of the land, -without any compensation for it, when compensation was its main and principal object.
To arrive at the conclusion that Waterhouse was in possession under a contract for a conveyance in future, a deed of conveyance must be taken to be a contract; and the main articles of that contract must be supplied, not only in the absence of them from the contract, but by expunging articles importing the contrary from it; and the meaning and intent of the parties must be taken to have been altogether different from what they appear, and purport to be on the face of the instrument. It seems clear, if all these mutations cannot be made, that Simms was not a termor; that he had no power to make this deed to Waterhouse; that it was intended to be a deed of conveyance, and not a contract to convey; and that if taken to be a contract, it was not, in any single item, authorized by Mrs. Donelson.
The arguments founded on the reverse of these several propositions lead, as they were inevitably obliged to lead, to inaccurate legal conclusions; and the correct conclusion is, that the possession which Waterhouse had was a possession for himself, in fact, and in law, and not for or under Mrs. Donelson. In first Reeves, 321, if a person having seisin for life, or for years, or as guardian, or otherwise enfeoffed another to the prejudice of the right owner’, it was a disseisin. The right of a tenant to alien is one thing, and to retain possession against the landlord, which he has solemnly undertaken to redeliver to him, is another. He cannot do the latter, though *319 he is free to do the former; for by becoming a tenant he has not undertaken to give up any of the rights which pertain to him independently of that character.
If he may alienate by feoffment where no other- mode of alienation was open to him, now that there is another mode opened to him, by the Act of 1805, ch. 11, he mayas well use this, as before, he could use the feoffment. Going upon these pi-emises, the legal result is, that when Waterhouse came into possession under Simms’s deed he was in possession for himself, and in exclusion of the possession of Colonel Glasgow and Mrs. Donelson. It will be presently considered what will be the consequence of saying that Waterhouse came into possession as trustee for Mrs. Donelson, in the place of Colonel Glasgow; and whether he did, in fact, come in by this deed under an unproduced power made by Colonel Glasgow and Mrs. Donelson.
If we place ourselves under the guidance of authorities, the result is the same; namely, that under this deed Waterhouse was in possession for himself, and not for Mrs. Donelson!
When the authorities speak of an adverse possession, they either respect tenants of particular estates, their transfers to third persons, and their conversion of the possession held for their landlords into possessions adverse to the titles of their landlords, or they respect possessions taken by claimants in fee, or they respect the manner of' taking possession.
With respect to tenants of particular estates, as lessees, they may, by consent of their landlords, dissolve the connection between them, and hold thenceforward for themselves. But without consent the tenant cannot hold for himself adversely to his landlord. When a transfer is made by a lessee to a third person, and the lessee still continues in the actual possession as before, the landlord cannot be affected by the adverse possession till the particular estate shall be expired. Though if a tenant attorn to a third person, and disavow the tenure between him and his landlord, and refuse to hold under him, the possession of the tenant is thenceforward adverse to his landlord, as some suppose. See for these positions, 3 John. 290; 4 Hay. —; 4 John. 390; 2 Sch. & Lef. 624, 625. If A be a termor to B and C, and purchases in the title of D, then leaves the possession, and E enters, and when sued by the reversioner, offers to set up the title of D, E coming in under A, will not be permitted to do so, as A himself could not. 4 John. 211, 212. This proves nothing in the case where E comes in, under a deed in fee in himself, and not under A, in continuation of the possession which A had. The tenant of a termor, being in possession, cannot get in an outstanding title and use it against the landlord; 2 Bin. 450. It does not prove, if the termor convey in fee to B, and B enter under the deed, to hold for himself, that his possession is a continuation of that of the termor. A person in possession as lessee cannot acquire a title adverse to that of the landlord, and use it' against him whilst in pos *320 session; 1 Sch. & Lef. 381; but this does not prove that if the lessee in the character of figent for his principal, sell and convey in fee to another, that the possession of the latter is the possession of the principal. Simms cannot properly be treated as agent or attorney, when a part of the deed is to be lopped off, as an excess, beyond the power, and as making the residue supposed to be valid, by sufficient authority, and at the same time as lessee, when the possession taken under his deed is to be called the possession of Mrs. Donelson. He should be considered as either one or the other, and not both; and if not as lessee, then as an agent; that as such agent he could not delegate his power ; and that a possession by his permission as agent cannot be considered as a possession by Mrs. Donel-son by her lessee.
In England a lessee or agent for his principal could not convey to a third person a title adverse to that of his lessor except by feoffment, for he cannot sell a right of entry or chose in action. And no case from thence can possibly establish what the cases adduced from the English books are cited to prove; and this demonstrates that the effect of the cases cited is misunderstood. The nearest that the English cases can come to that before the Court is, the case of a dispossessed claimant of the inheritance, entering upon the lands, and ousting the lessee, or claiming by a deed from the lessor, the legal extent of which the latter contests, and taking possession in place of the lessee.
But in these and similar instances the possession would not be the possession of the lessor, but of the enterer. The principle of this case is supposed to be the same with that where a covenantee, for title to be made in future, enters and holds possession; in which case the possession of the covenantee would be that of the covenantor, or vendor. But certainly, the same consequence is not deducible from a different case, where the possessor is not a covenantee for title, but is the bargainee, by deed, or holder of the title itself.
This case must be determined by analogous principles, and as those of the dispossessed claimant in fee, and of the purchaser by deed under the lessor, are much nearer to this than those which are cited in the argument, they should therefore be assumed as our guides on the present occasion.
If A, who is in under B by an imperfect conveyance, say by the in-dorsement of a patent, keeps possession for B, and not for himself, he can never be protected by the Act of Limitations; for his possession being for B, and not adverse to B, can never be ripened into a perfect title. It is impossible that a position ending in such a consequence can be correct.
If the lessee cannot transfer by feoffment an adverse title to that of his lessor, then, suppose A to become the lessee of B for twenty years, and at the end of one year, by the death of an ancestor, an adverse title to that *321 of his lessor shall come to him, the lessee. If he cannot transfer it, then, as lessee for the lessor, he must keep possession for the lessor against his own title, and at the end of seven years extinguish his own title, which came by descent from his ancestor. Is it possible that a doctrine which terminates in such a result can abide the touch of investigation for one moment ? Is there no way of reconciling the duties which the tenant owes to his landlord with those which he owes to himself? If he must not keep possession in appearance for his landlord, and as his tenant, but secretly in aid of his own adverse title obtained since the commencement of his lease, and by so doing oust his landlord of his' title, does it follow from hence, that he may not openly transfer his adverse title to one who, taking possession under it, gives notice to the landlord by the most notorious means, to be upon his guard and to provide for the maintenance of his own title in time? Surely, all this may be done with the most perfect good faith, and consistently with the rights of all concerned. Therefore it is that the tenant may enfeoff a third person by livery of seisin giving notice to his landlord and to all others concerned, of the intention to bring forward the adverse title. And if by feoffment, why not, since the Act of 1805, by a deed and by taking possession under it by the bargainee, at least from the time of taking such possession and displacing the tenant’s possession. Taking it for granted, then, that Simms was the lessee of Colonel Glasgow, it will not follow that when he makes a deed in fee to a third person, and the latter enters, that his possession is the possession of the lessor. It is, on the contrary, a possession for himself adverse to those who 'claim in opposition to the lessor’s title, and adverse also to the title of the lessor.
As to the possession of those who do not claim as lessees or particular tenants, their possession is adverse when it excludes those who claim title for themselves, for this is an ouster of possession; Cowper, 217. Possession under color and claim of title, is adverse when accompanied with a claim of the entire estate; 9 John. 180; and the intent to claim the whole estate may be discovered by ex post facto circumstances, as by doing such acts as belong to an owner to do. This possession may be taken either by one’s self or by a lessee. If one enter on the lands of an infant, he shall be charged as guardian, but if he enter under a claim for himself of the whole estate, he cannot be so charged. So, if one enter, claiming lands to which another is entitled, under a pretended conveyance in fee for himself, such possession cannot be in accordance and unison with the title of the other, but aims at the destruction of it. Every act must be taken according to the intent; and the conclusions of law must be made upon the act and intent. A man cannot be told, your intent is to enter for yourself, but the law says, you shall not be deemed to possess for yourself. On the contrary, the law will say, the fact is that you entered for yourself and the fact must be estimated with a view to its realities and existing circum *322 stances, and not perverted by fiction, and must draw after it legal consequences, such as reason and justice will cause to follow it. And in all instances where one enters for himself, his possession shall be deemed to be a possession for himself and not for another. As Waterhouse, in the case before us, entered for himself, under a claim of title in himself in fee, his possession was adverse to that of Colonel Glasgow and of all those whq claim under him. It is a possession of the same estate, as against all persons who claim by a title distinct from that claimed by Stockely Donelson, and those who come in under him; but as amongst the claimants themselves, is for the benefit of the possessor, exclusive of all other sub-claimants. How is it possible that Waterhouse continues the possession of Mrs. Donelson, when she had neither the possession nor the right of possession, but was a mere cestui que trust who was entitled to neither, and who might be sued by the trustee in trespass for coming upon the land. A deed under her express power to convey the possession by name and in pointed terms, could not have transferred the right of possession ; much less, can it be said that Waterhouse was in of Glasgow’s possession, for the latter gave no power to Simms to transfer his right of possession to Waterhouse; nor a power to make any transfer at all to anybody, if in truth his deed was founded on the power given to him by Mrs. Donelson.
But what if Waterhouse came into possession under another power than that which is put upon this record, which is only a power from Mrs. Donel-son, written by Colonel Glasgow and attested by him as a witness ? Whereas, the power referred to in the deed from Simms to Waterhouse is one given by Colonel Glasgow and Mrs. Donelson. Then here is a conveyance from the trustee, with the assent of the cestui que trust to Water-house, and with notice which he has by the deed from Stockely Donelson, that she is the cestui que trust. With this notice he must be a trustee in the place of Colonel Glasgow, and then the possession of Waterhouse would be the possession of Mrs. Donelson. That this was his real situation is rendered not improbable by his, Waterhouse’s, purchasing three or four years afterwards, from Rhea and at the sheriff’s sale, for why make those purchases if he had already obtained under Stockely Donelson, a title anterior in its commencement to either of these. Colonel Glasgow and Mrs. Donelson might have sufficient reasons for such a change of the trustee if Simms was about to remove, and Colonel Glasgow and his daughter likewise, to a remote residence, leaving Waterhouse on the spot. The consideration of $500 is not a valuable but a colorable consideration; Cowper, 712, 714, being excessively inadequate to the real value. A transmutation of the title and possession from Glasgow to Waterhouse, through the mediation of Simms and the assent of the cestui que trust, could be effected very properly by the means employed. The interest of the cestui que trust would not be transferred, because an intention to transfer her *323 trust or equitable estate is not intimated in the deed, nor can it be inferred from the unproduced power. Nor can anything more be inferred than her consent that the trustee should be changed by an alienation of the first trustee, of his legal title, to the second trustee. I have called this a color-able, and not a valuable, consideration, to show, that the consideration of $ 500 applies to the legal estate, and not to the trust, which was then worth 250,000, or more, and to show, that therefore, it was not the intent of this deed, if founded upon an unproduced power, to pass the trust estate of Mrih Donelson. Say that Waterhouse came into possession under an unproduced power from Colonel Glasgow and Mrs. Donelson, and the consequence is, that Waterhouse was a trustee of the legal estate for Mrs. Donelson ; and that being in possession as her trustee, he could not divest himself of that character but by a previous conveyance of the legal estate to some other trustee that she might name. These probabilities are strengthened by other considerations. The deed of 1797, though it purported to be made for carrying into effect marriage articles, made before marriage, does not show that they were registered within seven months, as required by the Act of 1785, ch. 12; nor is this deed itself registered within seven months, as required by that Act, and is therefore void against creditors; nor does it appear to have complied with the other essential requisites of this Act; therefore it was void as against the creditors of Stockely Donelson. The deed of 1799 is not founded upon marriage articles made at any time; it is not for securing $20,000, but for vesting in the wife an equitable or trust estate in the 19,000 acres of land contained in the deed. It was a voluntary deed from husband to wife, and -was void as to all the creditors of Stockely Donelson ; Colonel Glasgow, therefore, would not authorize sales to be made in his name, for fear of being involved by the creditors of Stockely Donelson. Though the power was written by him, and attested as a witness by him, he withheld his signature from it. He might have been willing that Simms should convey to Waterhouse, to the end that the latter might contend with the creditors, and also with adversary claimants, and to enable him to do so, might have been willing that a deed should be made to him, such as would purport, on the face, to convey the legal title from himself, but which, at the same time, could not subject him to any responsibility. If such could be discovered to be the real state of the act, then Waterhouse must be presumed to have come into possession under engagements not to oppose, but to maintain, the equitable or trust estate of Mrs. Donelson as far as was in his power, and would not be allowed to bar it, by barring the legal estate in Colonel Glasgow, through the medium of an adverse possession, and the Act of Limitations, or otherwise. But, though the consequence of considering the deed from Simms to Waterhouse to be founded upon an unproduced power from Colonel Glasgow and Mrs. Donelson, would be, that Waterhouse *324 had the legal estate and title which Glasgow had, and was, like him, a trustee for Mrs. Donelson, and could not be recovered against in ejectment by persons claiming under Glasgow; whereas, if he came in under the power put upon the record, that he had not any legal title, derived from Glasgow by the deed from Simms, yet I cannot believe but that it was really founded upon the power set forth, and there are many reasons for thinking so. First; being signed by Mrs. Donelson, and written and attested as a witness by Colonel Glasgow, it might, therefore, have been supposed to be agreed to by him, and for that reason, might be called his and her power. Secondly; this power is produced and no other. Thirdly; if the deed were founded on a power from both, then the character of it would be to convey to him the legal estate which was in Colonel Glasgow, and then he would have a good legal fee as trustee for Mrs. Donelson, and yet, he claims under the deed in exclusion of her; therefore, not under a power from both, but under the power put upon this record; and if made by virtue of this power, the deed is not authorized, and must be taken to have been made by Simms, under the pretence of this power, which does not authorize it. The possession, then, which Waterhouse took after the date of Simms’s deed to him was without any authorization but that of a deed in itself void ; and his possession under it was for himself, and not for any other person; and the extent of his possession under this deed was to the limits described in the deed; and Waterhouse has in his favor one of the requisites to make a good title under the Act of Limitations; namely, an adverse possession.
But another ingredient is also requisite, and makes a very important question, in this cause, whether Waterhouse had a color of title accompanying his adverse possession, such as is requisite to complete his title, and to make it indefeasible.
All other acts’of limitation but our own, whether of England or of our sister States, are built upon the possession alone, and in some instances bar only the remedy for the recovery of possession. In this State, not only the right of possession is barred, but the right of property also, and the adverse possessor acquires what his adversary loses. In consequence of this rule there must be a color of title combined with the possession. The reasons for this combination are stated 2 Haywood, 88, 97. and in Barton and Shall, at Nashville, August term .of the Supreme Court, 1823. What color of title is, may be seen by the numerous definitions given of it in our own decisions. “ It is a legal title in form or appearance by grant, or its equivalent, deed, will, inheritance in descent, or other mean by which a legal title may be, and is supposed to be, passed to the claimant.” It is not an equitable title by bond or articles for a conveyance or other equitable estate, in which case the possession is counted for ■the obligor, covenantor, or trustee. This legal title, in form or appear- *325 anee, must be accompanied with circumstances which show that the grantee may reasonably believe that this title, inform or appearance, which he has, is a good one; and that, in taking possession under it, he is not a trespasser, known to himself to be so, or which, at least, do not show the contrary ; though, in our reported cases, the definitions of color of title are variously worded, they all communicate the same idea. In 2 Haywood, 12, “where one settles upon the lands of an individual, knowing that he is a trespasser in doing so, which he must know, if he has no color of title,” says the book, “ he is not entitled to the benefit of the Act of Limitations.” In 2 Haywood, 57, it is said to be, “ Where a man has settled upon and improved lands, upon the supposition that they are his own, and continued in the occupation for seven years, if he has no color, he cannot suppose that the lands are his own, and he settles upon them of his own wrong.” In 2 Haywood, 69, “ Possession, taken and kept, with a reasonable ground of belief that the land so possessed does belong to the possessor, as by some deed or the like from some person having a pretended title.” In 4 Haywood, 185, “ A conveyance of some sort by deed or will or inheritance, which he may believe to be a title.” In 5 Haywood, 288, “ A color of title is where a conveyance is made by an apparent owner, or person apparently having an authority over his estate, which conveyance would actually have passed the title, had the circumstances existed which were supposed to exist. Such color is not raised, either by bond, covenant, or agreement to convey hereafter.” In Barton and Shall, August, 1823, it is said: “ Mankind would never agree to a perpetual bar of the right of property, were it to be conceded, to a mere naked possessor, who came upon the land without any reasonable pretence, and knowing himself, at the time, to be a violator of the law. Either he must be excluded, or the perpetuity of the bar could not be established ; ” and again, in the same opinion: “ The deed is to prove a color of title, — in other words, that the possessor is not a mere trespasser, known to himself to be so.” It may, I think, be added to these definitions, that color of title sometimes comes from the insufficiency of the conveyance made by one having a good title. For illustration of the. definition, let us exemplify a few instances in which color of title arises, and they will instantly fall into classes: First, of imperfect conveyances from persons having good titles ; secondly, of conveyances in legal form from persons who are only the apparent and reputed owners.
First, of a grantee conveying by the indorsement of his patent. Here the title of the person conveying is good, but the conveyance itself is illegal, and inadequate to the passing of the lands to the purchaser. If, before the Act for selling lands by fieri facias, a creditor had obtained judgment, and had caused them to be sold by fieri facias, and the purchaser had obtained a deed from the sheriff, the' title of the defendant was good, *326 but the sheriff’s deed insufficient. If a devisor, having a legal and perfect estate in fee, devises the same to A, who takes possession, and the will is proved and registered, but has not been attested by the requisite number of witnesses, or has been attested by the requisite number, who have not signed all of them in his presence, here the title is good, but the mode of transfer insufficient. If, before the Act for the privy examination of femes covert, &feme and her husband had conveyed by deed to A, here the title is good, but the deed incompetent to convey the estate out of the feme to the bargainee. If, since the Act, a feme and her husband convey, and she be never privately examined, though the deed be proved and registered, here the title is good, but the deed incompetent. In these and all other instances where the title of the bargainor is a good one, but the mode of conveyance from him to the bargainee is insufficient, the attempt to convey is free from imputation, and both the vendor and vendee may justly and rightfully obtain' the perfection of the contemplated transfer. There is a color of title in the possessor capable of being made complete and indefeasible by the Act of Limitations.
Secondly, there are other instances, where the title of the vendor is only apparent and reputed, and the conveyance to the vendee is in legal form in which the color of title arises, and is equally capable of the fostering aid of the Act of Limitations. The State grants to A, and there are two persons of the name of A, and one of them, for a valuable consideration, sells to B, who enters upon the possession, here the conveyance is good in form, but the title of the vendor is only an apparent or reputed title. Suppose a guardian to sell the lands of his ward by an improper order of Court, and purchase them himself and sell to A, after a deed made to himself; here the deed is legal on the face and in form, but the title is only apparent.
A dies and his lands descend to his two sons, A and B, the former of whom is a bastard, born in a foreign country, and this circumstance is not known here, and they both enter as heirs, and A sells and conveys his share to C, by metes and bounds; C has a color of title, because A, who sold and conveyed to him, had an apparent and reputed title. A lives abroad and gives power to B to sell his lands in this State, and then A dies, and soon afterwards, and before his death is known* in Tennessee, B sells to C for a valuable consideration; here the power to B to sell was an apparent power, and C has a color of title.
From these examples it is perceptible that the imperfect title of a possessor in order to merit the protection of the .Act of Limitations must not be evidently unconscientious. It must not be by a deed which the possessor has forged, nor which appears on the face of it to be no deed, or one by which it is apparent that the bargainee has no title.
Now for the application of these principles. First, this deed, if it be *327 one at all, being incorporated with the power, put upon this record 24th of September, 1806, and being founded upon it, shows upon the face that Simms had power to sell, Mrs. Donelson reserving to herself the power to convey, and therefore, that Simms had no power to convey, and yet does convey. It is a felo de se upon the face, and it is not possible that Water-house could think that he was not a trespasser in taking possession under it. It shows upon the face that Simms could not sell for less than $ 1 per acre for the high lands and $ 1.50 for the low lands. And it is admitted at the bar by the counsel on both sides that in the bounds of the nineteen thousand acres, there are two hundred and fifty thousand acres, which, according to the power, ought to have sold for at least $250,000, and yet is sold for $ 500, and even that sum does not appear by any receipt on the back of the deed td~ be anything more than a mere nominal sum. Was it possible, under these circumstances, for Waterhouse to suppose that he had any title to this land under this deed ? The deed upon the face proves it to be impossible, and therefore the Act of Limitations will not protect him.
But again, can it be said, that Waterhouse had any deed at all ? From whom did he have it, and whose deed is it ? The deed of Mrs. Donelson ? She never signed or sealed it; she never gave power to Simms to sign or seal it. Then it is not her deed. Is it the deed of Simms ? It does not purport in the face of it to be his deed, but the deed only of Mrs. Donel-son. Then it is not his deed; and if not the deed of either, it is, correctly speaking, the deed of no one. With respect to Waterhouse himself, and for any advantage he can take by it, it is not the deed of any one; though as to third persons and strangers, who see him in possession under it, it may be such an appearance of title as will make good, deeds made from him to sub-purchasers who continue under their own deeds for seven years. It cannot be imputed to them that they, in a deed to which they were parties, used the same words that he used in his deed, demonstrative of a knowledge that the deeds under which they claimed were nullities for the purpose of conveying titles. But this is said by way of illustration only, not meaning to give any conclusive opinion upon the point. We are of opinion that Waterhouse in the case before us, though he had an adverse possession under this supposed deed, had not, by that deed, such a color of title as would draw to itself the protection of the Act of Limitations, and that the lands he is sued for in this declaration, may be recovered from him notwithstanding a seven years’ possession under it.
We now come to the title derived to Waterhouse under the deed of Stockely Donelson, made to Rhea in 1800, who made a deed to Water-house on the 22d September, 1813, which was registered in December, 1814. This action was commenced on the 27th of July, 1821, more than seven years after the date of the deed, but in less than seven years after *328 the registration; and here are presented two questions: first, is this deed from Rhea to Waterhouse a good color of title ? Secondly, is the possession under the Act of Limitations to be counted from the date of the deed or from the day of registration ?
First, if some other person, and not Rhea, had made this deed to Water-house, and he, Waterhouse, had taken possession under it, and kept it for seven years, he would have had a good title, under the Act of Limitations, according to the case of Barton and Shall, at Nashville. It is not material to inquire whether this was a good deed or not, for the very attempt to make good the title under the, Act of Limitations is an admission that it was not a good deed; to inquire whether the deed be a good one, or whether it is capable to be made good by the Act of Limitations, are distinct questions, and ought to be kept perfectly separate from each other. Assuredly Rhea could not make a deed for any specific part of the land of which he was only tenant in common with Stockely Donelson, but when made, it might become a color of title to him who was in possession under it. It carved a distinct part from the whole of what was claimed by Colonel Glasgow. Suppose Rhea had conveyed the whole nineteen thousand acres by metes and bounds, and the bargainee had remained in possession under it for seven years ; would not the claimant out of possession be barred ? Then why not if only a specified part be conveyed ? Shall the claimant out of possession be set free from the obligations imposed by the Act of Limitations, and come at the distance of one hundred years against Water-house and his heirs or bargainees, and all those who claim or possess under them by deeds fairly and honestly obtained? The hardship on the side of, the possessors would be as great as that on the side of the claimant; and the fault of so much delay would be imputable to the claimant who ought to bear the inconveniences that resulted from it.
Another question is, whether the adverse possession under the Act of Limitations is to be counted from the date of the deed, or from the registration of it. Registration is'ordained for the benefit of creditors and purchasers, and when registered within the appointed time, the deed shall be good from the date. For being to be proved in court, the sitting of which may be at some distance, and then to be carried to the register’s office and registered; this cannot be done in a moment, and some time must necessarily be allowed. If done within time, the law imputes no blame to the bargainee; and though one purchase the same lands in that time, or get a mortgage from the bargainor in that time, he shall not be heard to complain that the bargainor did not register the deed on the day of its date. If, as to those persons for whose benefit the registry acts were made, the deed, when registered, shall take effect from its date, shall it be prevented from doing so for others who were not within the view of these acts ? If registered long after the expiration of the appointed time, *329 say ten years, and the mortgagee or purchaser had notice of the deed, though not registered, it shall, when registered, relate to the date, and overreach the mortgage or subsequent purchase. And shall it be of no effect as to the disseisee, who has notice by the possession, which is adverse to his, and is called upon by it to assert his right in time ? If a verbal information to the mortgagee or subsequent purchaser will fix him with notice, shall not an open and notorious possession, unremittingly continued, be notice to the disseisee ? If possession be requisite by law for the purpose of affording notoriety, must color of title be called in to show not only what it is peculiarly designed for, but the same notoriety that is given by possession ? As to the bargainor, some say that the deed is good whether registered or not. If not registered, and the deed upon scrutiny be found not to be in proper form to pass the title, shall he, the bargainor, not be repelled by the Act of Limitations, because the bargainee was in possession seven years under a deed not registered, because not required by law to be registered.
Thousands of deeds have not been registered till many years after the date; are all the possessions under them to be rendered of no avail to the possessor under the Act of Limitations till registration shall have taken place ? Considering the circumstances of the country, the adoption of such a rule would be in some measure tantamount to a repeal of the Act of Limitations.
I am of opinion, therefore, that the Act of Limitations runs from the date of the deed, if there be then an adverse possession which continues with it thenceforward for seven years, and that the Act covers all the lands contained within the bounds of the deed, if the possession were under and according to the deed.
The sheriff’s deed to Waterhouse under Cowan’s judgment, comes next to be considered. The judgment was obtained in the lifetime of Stockely Donelson, in the year 1805, and was a lien upon these lands if it had appeared that the debts of Stockely Donelson could not be satisfied without resorting to these lands, but that not appearing, the deed from Stockely Donelson in trust for his wife, which he made in 1799, must be taken to be a valid deed, and that he had no estate in these lands, which were liable to an execution against his estate. He had not after the deed of 1799, even an equity of redemption which he had under the deed of 1797. The sheriff’s deed, therefore, can be made good only as color of title by seven years’ possession. The sheriff’s deed was made the 27th of July, 1814; when were the seven years completed? The Act of. 1797, ch. 43, § 4, says that the person who shall neglect for seven years from the time of such peaceable possession having been obtained, &c. “ From the time ” is inclusive of the day-when the possession commenced, which was on the day of the date, the 27th of July, 1814, and of course would end on the 26th of July, 1821. *330 But then, according to 2 Sal. 625, the seven years will not be completed till the last moment of that day ; and before that moment this action was commenced. The former part of the Act is express that the person in possession must have had seven years’ peaceable possession, and this he will not have had till the last moment of the last day. This action was therefore commenced before the expiration of seven years, and no title has been acquired under the sheriff’s deed. What is the result of these several conclusions ? That Waterhouse is entitled to all the lands in Rhea’s grant, and the plaintiff, Martin, to the residue; that the Circuit Court ought to have told the jury that Waterhouse, being in possession under the deed from Simms, was in possession adversely for himself, and that the deed from Simms was not a color of title for him which could be made good by the Statute of Limitations.
Reverse the judgment and remand the cause to the Circuit Court to be tried de novo.